United States Bankruptcy Court

Northern District of Illinois

Eastern Division

| | |
|---|---|
| In re:<br><br>Monik Chlad and Eric Vehovc,<br><br>        Debtors. | Bankruptcy No. 13-bk-40141<br><br>Chapter 7 |
| Mitchell Chapman and Semy<br>Investments, Ltd.,<br><br>        Plaintiffs<br><br>        v.<br><br>Monik Chlad and Eric Vehovc,<br><br>        Defendants. | Adversary No. 15-ap-289 |

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW (COUNT 2)

Monik Chlad and Eric Vehovc (the "Debtors") filed a joint petition for relief under chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et al.* Two of their creditors, Mitchell Chapman and Semy Investments, Ltd. (collectively, "Chapman") filed an adversary complaint against them seeking denial of a discharge pursuant to 11 U.S.C. § 707(a)(4) (Count 2) and, alternatively, a determination that the debt owed to them by the Debtors is excepted from a discharge pursuant to 11 U.S.C. § 523(a)(2) (Count 1). Thereafter, Count 2 of the complaint was severed for separate trial.

Trial on Count 2 of the Complaint was held over the course of five afternoons. At the close of the evidence, both parties having rested and submitted their final arguments in the form of proposed findings of fact and conclusions of law, this matter was taken under advisement. Finding of Fact and Conclusions of Law on Count 2 of the Complaint will now be made and entered.

For reasons stated below, Chapman has shown that the Debtors made false oaths in connection with their bankruptcy case, and that the Debtors' representations were knowing and fraudulently made. Accordingly, Debtors discharge will be denied pursuant to 11 U.S.C. § 727(a)(4). Judgment will be entered accordingly.

# FINDINGS OF FACT

## Background

Monik Chlad and Eric Vehovc (the "Debtors") filed a petition under chapter 7 of the Bankruptcy Code, title 11 of the Unite States Code on October 14, 2013 (the "Petition Date"). (PX 1.)  The Debtors are husband and wife, for now. (Trial Tr., vol. I, 37:25–38:15, Nov. 28, 2016.)  Around October 2012, the Debtors commenced legal separation proceedings. (*Id.* 38:9–11.) The Debtors later commenced divorce proceedings, which were stayed by their bankruptcy filing. (*Id.* 38:12–21.)

Chlad owns 100% of a company named Lockwood Development Inc. ("Lockwood"). (*Id.* 38:22–39:2.)  Prior to their separation, Vehovc and Chlad both worked for Lockwood, where they shared the duties of running the business. (*Id.* 39:3–17, 43:1–10.)  Just before the Debtors' separation in the later part of 2012, Vehovc stopped working for Lockwood. (*Id.* 39:9–17.)

Lockwood is in various lines of business related to real estate, including managing property for others, general contracting, and purchasing real estate for investment or to flip. (*Id.* 39:18–41:13.)  The Debtors also own several parcels of real estate in their own names. (PX 3, at 1.)

As part of their business—both Lockwood and personal—the Debtors, among other things, purchased and sold real estate, researched real property records, prepared loan documents and deeds, and maintained a ledger business transactions. (*Id.* 43:24–44:10; Trial Tr., vol. IV, 83:11–17, 88:24–89:4, Dec 1, 2016.)

Although Chlad was originally born in Poland, she speaks fluent English and obtained a college degree in finance from the University of Illinois at Chicago. (*See* Trial Tr., vol. I, 154:6–24, 155:24–157:10.)  Chlad is also a licensed real estate broker. (*Id.* at 43:21–23.)

2

### Statements Under Oath in the Bankruptcy Case

On January 14, 2014, the Debtors filed their schedules A, B, C, D, E, F, G, H, I,
and J (the "Schedules") as ECF No. 36. (PX 3.)  The Debtors also filed their statement of
financial affairs (the "Statement of Financial Affairs") as ECF No. 40 (PX 4), and their
Declaration Regarding Electronic Filing for Documents Filed After Petition (the
"Declaration") as ECF No. 38 (PX 2).  The Debtors each signed the Declaration. (PX 2;
Trial Tr., vol. I, 46:19–24, vol. IV, 84:25–85:9.)

In the Declaration, the Debtors stated "I (We), Monik Chlad and Eric Vehovc the
undersigned individual(s), hereby declare under penalty of perjury that I(we) have
reviewed the Post-Petition Documents being filed simultaneously with this Declaration
and that the information therein is true and correct." (PX 2.)  The Declaration defined
the term "Post-Petition Documents" to include the Schedules and the Statement of
Financial Affairs. (PX 2.)

Before the Debtors signed the Declaration, Peter Nabhani, the Debtors'
bankruptcy attorney, met with the Debtors, reviewed the Schedules and Statement of
Financial Affairs with them page by page, and advised them of the consequences of
making any misstatements on the schedules. (Trial Tr., vol. IV, 12:12–24.)

<u>The Van Buren Property</u>

Schedule A requires debtors to list "all real property in which the debtor has any
legal, equitable, or future interest …." (PX 3, at 1.)  On Schedule A, the Debtors listed
their interest in several parcels of real estate. (*Id.*)

The Debtors did not disclose on Schedule A any interest in the real estate located
at 3928 W. Van Buren St., Chicago, Illinois (the "Van Buren Property"). (*Id.*)  The
Debtors also listed an $80,000 debt as being secured by a property located at 523 N.
Hamlin in Chicago (the "Hamlin Property"). (PX 3, at 7.)

On the Petition Date, the Debtors owned the Van Buren Property in their own
names. (PX 5, 6, 7; Trial Tr., vol. I, 49:18–25, vol. IV, 87:1–7.)  The $80,000 debt the

3

Debtors listed as secured by the Hamlin Property was in fact secured by the Van Buren Property. (Trial Tr., vol. III, 112:22–113:9, Nov. 30, 2016.)

The Debtors do not dispute that the Van Buren Property should have been listed among the other six properties disclosed on Schedule A, but contend that the Van Buren Property was disclosed to their bankruptcy attorney and it was their attorney who mistakenly omitted the property from their Schedules. Schedule A discloses the Debtors' interest in six other properties, but omits the Van Buren Property, which was owned by both Debtors personally. (*See* PX 3, at 1; Trial Tr., vol. I, 49:5–25, )

Prior to the Petition Date, the Debtors each gathered information regarding their real estate to include in their Schedules. Vehovc provided their bankruptcy attorney with a spreadsheet he maintained for the purpose of keeping track of which parcels of real estate were owned by Lockwood and which were owned by the Debtors personally. (Trial Tr., vol. IV, 87:12–88:19.) Vehovc also did additional research that was necessary to make sure he had the correct information on the properties. (*Id.* 88:20–23.)

Chlad knew that some parcels of real estate were owned by Lockwood, and some were owned by the Debtors personally, but at first she did not know exactly which ones were owned which way. (Trial Tr., vol. II, 30:20–31:2, Nov. 29, 2016.) Chlad therefore asked William Bein, her assistant, to research which parcels of real estate were owned by herself and her husband personally, and which were owned by Lockwood. (Trial Tr., vol. I, 49:25–51:18, 52:13–20.)

At Chlad's instruction, Bein researched which parcels of real estate were in the Debtors' names, and which were in Lockwood's name. For each property owned by the Debtors or by Lockwood, Bein put together a file folder reporting the results of his research. Each folder contained a one-page summary of his findings, along with relevant documents. (Trial Tr., vol. II, 75:5–76:7; PX 6.)

Bein's report on the Van Buren Property indicated that the Debtors owned the Van Buren Property in their own names. (PX 6.) Bein provided all of the folders with his reports to Chlad and to Nabhani. (Trial Tr., vol. II, 76:8–12.)

Prior to the Petition Date, Bein also authored a spreadsheet—which Chlad specifically approved—indicating that the Debtors wanted to keep the Van Buren Property despite the anticipated bankruptcy filing, and that the Debtors personally held title to the Van Buren Property. (*Id.* 83:12–19; PX 7.)

Prior to the Petition Date, Bein, Chlad, and Nabhani met in person several times to discuss Bein's work. (Trial Tr., vol. II, 77:15–78:6.) At these meetings, Bein, Chlad, and Nabhani discussed the Van Buren Property in more depth than most other properties because the property was an important one to Chald. (*Id.* 80:13–82:2.) Bein, Chlad, and Nabhani specifically discussed the fact that the Van Buren Property was owned by the Debtors and the active liens on the Property. (*Id.* 86:19–87:4.)

The evidence at trial indicates that the Debtors researched the title to their real estate and told their bankruptcy attorney that they owned the Van Buren Property. Therefore, the Debtors each knew or should have known that they owned the Van Buren Property and the status of liens on that property.

While the Debtors do not dispute that they reviewed each page of their Schedules with their bankruptcy attorney prior to filing those documents in the bankruptcy case, they testified that they failed to notice that the Van Buren Property had been omitted. Chlad testified that while she reviewed each page of the Schedules before signing them, she relied on the accuracy of the information provided to her attorney by Bein and believed that the information in the Schedules would be correct.

As of the date of trial, Schedule A had not been amended to correct the omission of the Van Buren Property or the lien on the Hamlin Property.

<u>The Edgebrook Bank Guarantees</u>

Schedule D requires debtors to identify "all entities holding claims secured by property of the debtor as of the date of filing of the petition." (PX 3, at 6.)

Schedule E requires debtors to identify "all entities holding priority claims against the debtor or property of the debtor, as of the date of the filing of the petition." (PX 3, at 10.)

Schedule F requires debtors to identify "all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition." (PX 3, at 11.)

The Debtors did not list Edgebrook Bank as a creditor on their Schedules. (PX 3, at 6–15.)

Prior to the Petition Date, Lockwood executed a promissory note dated December 30, 2009, in favor of Edgebrook Bank in the amount of $812,000. (PX 8; Trial Tr., vol. I, 61:5–16.)  The note was secured by a mortgage on a parcel of real estate located at the intersection of St. Louis and Flournoy in Chicago, Illinois, commonly known as 707 S. St. Louis or 3459 W. Flournoy (the "Flournoy Property"). (PX 8, at 2; Trial Tr., vol. I, 61:10–19.)  Lockwood executed the note in connection with its acquisition of the Flournoy Property. (Trial Tr., vol. I, 61:5–9.)  As part of this transaction, each of the Debtors executed a commercial guaranty dated December 30, 2009, guarantying Lockwood's obligations to Edgebrook. (PX 9, 10; Trial Tr., vol. I, 62:1–4, vol. IV, 89:8–12.)

Each guaranty specifies that it "will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full." (PX 9, at 1; PX 10, at 1.)

6

Lockwood owned the Flournoy Property on the Petition Date. (Trial Tr. vol. I, 65:11–13.)  It transferred the Flournoy Property to 3459 Flournoy LLC on or about August 14 or 19, 2014, ten months after the Petition Date. (PX 12; Trial Tr., vol. I, 65:14–18.)  3459 Flournoy LLC took over the Flournoy Property and the accompanying loan, so Lockwood was no longer liable on the note once it transferred the Flournoy Property to 3459 Flournoy LLC. (Trial Tr., vol. I, 65:19–66:7.)

The Debtors' guaranties were therefore in effect as of the Petition Date.

The evidence at trial shows that the Debtors were aware that the guarantees were in effect on the Petition Date, and that they were liable under those guarantees until Lockwood's obligations were paid in full, or Edgebrook Bank gave them a release. Their obligations under the guarantees were substantial.  Even if the bank was willing to work out a way to release the Debtors of their obligations, the Debtors were well aware of their obligations as of the Petition Date.

The Flournoy Property was the largest property Lockwood ever owned, and the related loan was the largest loan on a single property that Lockwood had ever taken out. (Trial Tr., vol. I, 66:18–67:2.)  Before the transaction, the Debtors had never guarantied such a large amount in a single transaction. (Trial Tr., vol. IV, 89:19–21.)  The Flournoy Property was also the most problematic of Lockwood's properties due to, among other things, drug and gang activity at or near the Flournoy Property. (Trial Tr., vol. I, 67:3–8.)

Prior to and after the Petition Date, the Debtors had multiple conversations with representatives of Edgebrook Bank, including John Ptak, about the Flournoy Property. (Trial Tr., vol. I, 67:22–68:14, 69:18–70:1, vol. IV, 90:19–91:5, 92:10–15.)  The Edgebrook Bank representatives told the Debtors they would try to work with them to find someone to take over the Flournoy Property in such a manner that the Debtors would not be liable to Edgebrook Bank. (Trial Tr., vol. I, 68:15–23, vol. IV, 91:2–10.)  However,

7

prior to the Petition Date, Edgebrook Bank never provided the Debtors with any writing releasing their guaranties of Lockwood's indebtedness to Edgebrook. (Trial Tr., vol. I, 68:24–69:3.)

As discussed above, Edgebrook eventually did find someone to take over the Flournoy Property: 3459 Flournoy LLC. Lockwood transferred the Flournoy Property to that LLC in August 2014—after the Petition Date. The sale price to 3459 Flournoy LLC was $775,000, which was slightly less than the outstanding balance of Lockwood's loan, resulting in a deficiency. (Trial Tr., vol. III, 62:17–24.) Absent a release of their personal guaranties, the Debtors would be liable for this deficiency amount. (*See* PX 9, 10.)

On August 18, 2014—after the Petition Date—Ptak sent an e-mail to Chlad and the Debtors' bankruptcy attorney, Peter Nabhani, relating to this transaction and indicating that the Debtors' personal liability to Edgebrook "will be released when the Bankruptcy court approves." (PX 13, at 8.)

After the Petition Date, the Debtors were still discussing with their bankruptcy attorney and with Edgebrook Bank the need to release their personal liability on the guaranties. (Trial Tr., vol. IV, 27:11–28:10.) Lockwood's obligation to Edgebrook Bank was not extinguished until the transfer to 3459 Flournoy LLC was completed. Until that point, the Debtors' guaranties were still in effect.

The Debtors do not dispute that they knew about the guarantees or the implications of the guarantees. Vehovc testified at trial that he knew about the Edgebrook Bank personal guaranty when he filed for bankruptcy. (Trial Tr., vol. IV, 92:5–9.) Chlad testified that she knew about the guarantees and had multiple conversations with Ptak from Edgebrook Bank to discuss a potential release; however, she acknowledged that no release was received before the Petition Date. (*See* Trial Tr., vol. I, 67:22–71:11.) She testified that she was told by the Bank that they did not need to worry about the guarantees (*id.* 71:12–20), and she therefore believed that "the personal

8

guarantees were no longer in presence . . . ." (*Id.* 66:11–12.) But Ptak testified that Chlad informed him that they would be filing bankruptcy and that Edgebrook Bank would not be scheduled. (*See* Trial Tr., vol. III, 28:10–23.) Thereafter, she continued to communicate with Ptak about the release. Chlad therefore must have understood that the guarantees remained in effect on the Petition Date, but chose not to disclose them in the Schedules. The Debtors listed on their Schedules other debts that arose from personal guarantees. (Trial Tr., vol. IV, 123:10–24.) The Debtors therefore knew or should have known that Edgebrook Bank was a creditor on the Petition Date.

Undisclosed Bank Accounts

Schedule B of the Official Bankruptcy schedules requires debtors to "list all personal property of the debtor of whatever kind." Category 2 on Schedule B is "Checking, savings, or other financial accounts . . . ." (PX 3, at 2.)

On their Schedule B, the Debtors disclosed one account at American Enterprise Bank owned by Vehovc, and one Citibank account owned by Chlad with an account number ending in 4404. (*Id.*)

On the Petition Date, Chlad owned a Citibank account with an account number ending in 5647. Chlad owned account no. 5647 with Jadwiga Chlad. (*See* PX 22; Trial Tr., vol. I, 114:13–10.)

On the Petition Date, Chlad also owned a Citibank account with an account number ending in 7296. Chlad owned account no. 7296 with Mariusz Furca. (PX 23; Trial Tr., vol. I, 130:4–131:6.)

The Debtors' statement that Chlad owned only one account was therefore false.

The Debtors knew or should have known the statement was false. The bank statements for Chlad's joint account with Jadwiga Chlad were addressed to Chlad at her address. (Trial Tr., vol. I, 130:23–131:22.) At trial, Vehovc testified that he knew about Chlad's joint account with Jadwiga Chlad, and that he knew the purpose of the

9

account was to transfer money from Chlad to Jadwiga Chlad. (Trial Tr., vol. IV, 112:15–24.)

Similarly, the bank statements for Chlad's joint account with Furca were also addressed to Chlad at her address. (Trial Tr., vol. I, 131:23–132:10.)  At trial, Vehovc testified that knew about Chlad's joint account with Furca, and he knew the purpose of the account was to transfer money from Chlad to Furca. (Trial Tr., vol. IV, 113:20–22.)

After the Petition Date, Chlad turned over bank statements for each of the joint accounts to her bankruptcy attorney, Peter Nabhani. (Trial Tr., vol. I, 132:11–133:2.)

Chlad spent money out of account no. 5647 in September 2013, just one month prior to the Petition Date. (PX 22, at 65–66.)  Chlad deposited money into account no. 7296 on October 21 and 25, 2013, just seven and eleven days after the Petition Date, and prior to the date that the Debtors filed their Schedules. (PX 23, at 53, 56.)  Chlad also deposited money into the account on December 30, 2013, just two weeks before she filed her schedules. (PX 23, at 58.)

The Debtors therefore knew or should have known that Chlad owned more than one bank account.

<u>Undisclosed Transfers and Gifts</u>

Question 7 of the Statement of Financial Affairs requires debtors to "[l]ist all gift . . . made within one year immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member . . . ." (PX 4, at 4.)  In response to Question 7, the Debtors marked the "None" checkbox appearing next to Question 7. (*Id.*)

Question 10(a) of the Statement of Financial Affairs requires debtors to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." (*Id.*)  In response to

10

Question 10(a), the Debtors disclosed a transfer to Northside Community Bank and no other transfers. (*Id.*)

In the two years prior to the Petition Date, Chlad transferred money to Jadwiga Chlad. Jadwiga Chlad is Chlad's mother and lives in Poland. (Trial Tr., vol. I, 114:13–17.) Chlad accomplished the transfers by depositing money in Chicago into the jointly owned bank account at Citibank referenced above and then allowing Jadwiga Chlad to withdraw money from ATMs in Poland using her own debit card. (*Id.* 114:18–117:16; *see* PX 22.) The purpose of the joint account between Chlad and Jadwiga Chlad was to transfer money from Chlad to Jadwiga Chlad. (Trial Tr., vol. IV, 112:21–113:1.) Through this procedure, Chlad transferred at least $2,648.02 to Jadwiga Chlad in the two years prior to the Petition Date. (*See* PX 22, at 11, 14, 17, 20, 22, 25.)

In the two years prior to the Petition Date, Chlad also transferred money to Mariusz Furca. Furca is a subcontractor who sometimes worked for Lockwood. (Trial Tr., vol. I, 130:4–9.) Chlad accomplished the transfers by depositing money into the other jointly owned bank account at Citibank and then allowing Furca to spend money from the account using his own debit card. (*Id.* 130:10–22.) The purpose of the joint account between Chlad and Furca was to transfer money from Chlad to Furca. (Trial Tr., vol. IV, 113:23–25.) Using this procedure, Chlad transferred at least $21,339 to Mariusz Furca in the two years prior to the Petition Date. (PX 23, at 2, 5, 8, 10–11, 13–14, 17, 20, 23, 26, 29, 37, 41, 53.)

Neither the transfers nor the accounts were disclosed by the Debtors in their Schedules.

As noted earlier, transfers by way of deposit into jointly owned accounts were made by Chlad personally, and bank statements for both accounts were addressed to Chlad at her address. (Trial Tr., vol. I, 130:23–132:10.) Vehovc admitted that he knew about Chlad's joint account with Jadwiga Chlad, as well as the joint account with Furca,

and that he knew the purpose of these accounts was to transfer money from Chlad to Jadwiga Chlad and Furca. (Trial Tr., vol. IV, 112:15–24, 113:20–22.)

After the Petition Date, Chlad turned over bank statements for each of the joint accounts to her bankruptcy attorney, Peter Nabhani. (Trial Tr., vol. I, 132:11–133:2.) Chlad herself used each of the joint accounts to transfer money to Jadwiga Chlad and Furca. (PX 22, 23.)

The Debtors therefore knew or should have known that Chlad had transferred money to Jadwiga Chlad and Furca.

The Shareholder Loan

As discussed above, Schedules D, E, and F require debtors to identify their creditors. The Debtors did not list Lockwood as a creditor on their Schedules. (PX 3, at 6–15.)

Question 3(c) of the Statement of Financial Affairs requires debtors to "[l]ist all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders." (PX 4, at 2.) The Debtors did not list any transfers to Lockwood. (*Id.*)

As shown in Lockwood's 2012 tax return, as of December 31, 2012, Chlad owed Lockwood a shareholder loan of $51,165. (PX 20, at 4.) The loan arose when the Debtors used Lockwood funds to improve or to pay off loans on properties that the Debtors owned personally, or when the Debtors just got a deed from Lockwood without paying Lockwood any money. (*See* Trial Tr., vol. IV, 103:2–13, 147:6–14.)

The shareholder loan had been in existence since at least 2010. As shown in Lockwood's 2010 tax return, the balance of the shareholder loan on January 1, 2010, was $1,270,106. (PX 18, at 4.) As shown on Lockwood's applicable tax returns, the shareholder loan was paid down in 2010, 2011, and 2012, from about $1.2 million to about $51,000. (PX 18, at 4; PX 19, at 4; PX 20, at 4.)

12

As shown on Lockwood's tax return for 2013—the year that the Debtors filed for bankruptcy—the shareholder loan was reduced from $51,165 at the beginning of the year to zero by the end of the year. (PX 21, at 5.)

Either the shareholder loan existed as of the Petition Date and the Schedules are false, or Chlad repaid the loan prior to the Petition Date and the Statement of Financial Affairs is false.

Vehovc was involved in preparing Lockwood's tax returns for 2010 and 2011, which detailed the shareholder loan, and he reviewed them before they were filed. (Trial Tr., vol. IV, 99:4–20, 101:4–9.) He testified that he did not discuss the shareholder loan with his bankruptcy attorney because he believed the loan was "an accounting entry made by an accountant trying to balance some numbers . . . ." (Trial Tr., vol. IV, 111:24–112:5.) He testified that the shareholder loan was an accounting entry intended to make sense of the transactions between them and Lockwood. Therefore, he "didn't feel that it was a material thing to the case." (*Id.* at 110:2–8, 112:5–7.)

Chlad reviewed Lockwood's tax returns for 2010, 2011, and 2012, all of which detailed the shareholder loan, before those returns were filed. (Trial Tr., vol. I, 92:12–20, 97:3–15; 109:1–12.) She also signed Lockwood's tax returns for 2010, 2011, and 2012. (PX 18, at 1; PX 19, at 1; PX 20, at 1.) Lockwood's tax preparer discussed the shareholder loan and its reduction with Chlad. (Trial Tr., vol. II, 161:9–22.) She therefore knew or should have known about the existence of the shareholder loan.

Chlad also reviewed Lockwood's tax return for 2013 before it was filed, and that return showed the final repayment of the shareholder loan. (Trial Tr., vol. I, 110:12–111:4.) She signed Lockwood's tax return for 2013. (PX 21, at 2.) After she reviewed Lockwood's tax return for 2013, Chlad also signed a document stating, "I acknowledge that all of the information and data contained in this tax return was supplied to my tax preparer by me. This information and data is true, correct, and complete to the best of my knowledge." (Trial Tr., vol. I, 113:9–19; PX 21, at 19.) Although she testified that the

13

tax returns were reviewed and signed by her after the Petition Date and after the Schedules and Statement of Financial Affairs were filed, the existence or payment of any shareholder loan was not disclosed in her Schedules or Statement of Financial Affairs, nor were those documents amended to correct any prior statements prior to trial.

Income Sources and Amounts

Question 1 of the Statement of Financial Affairs requires debtors to state "the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced." (PX 4, at 1.)

Question 1 also requires debtors to state "the gross amounts received during the two years immediately preceding this calendar year." (*Id.*)

In response to Question 1, the Debtors stated that Vehovc's income for 2012 was $38,363 and that the source of Vehovc's income was American Enterprise Bank. (*Id.*)

In response to Question 1, the Debtors stated that Chlad's income for 2013 was "$90,000 (est)" and that the source of Chlad's income was Lockwood. (*Id.*)

Question 2 of the Statement of Financial Affairs requires debtors to state "the amount of income received by the debtor other than from employment, trade, profession, operation of the debtor's business during the two years immediately preceding the commencement of this case. Give particulars." (*Id.* 1–2.)

In response to Question 2, the Debtors marked the "None" checkbox appearing next to Question 2. (*Id.*)

In 2012, Vehovc received $15,500 in income from Lockwood in 2012. (PX 14.) Although Vehovc's income in 2012 was properly reported, the Debtors' statement that all of Vehovc's income in 2012 was from American Enterprise Bank was incorrect.

Vehovc worked at Lockwood until mid to late 2012, shortly before the Debtors separated. (Trial Tr., vol. I, 74:6–16.)  On the Petition Date, the Debtors knew that Vehovc had received income from Lockwood in 2012. (Trial Tr., vol. I, 75:7–11, vol. IV, 97:15–98:7.)  Vehovc testified that he disclosed his income based on his 2012 tax return and that he did not realize at the time he filled out the schedules in January of 2014 that the 2012 gross income taken off his tax returns included income from Lockwood. (Trial Tr., vol. IV, 97:18-23.)  He worked at American Enterprise Bank beginning in 2012, and that was his sole source of income in 2013 and 2014. (*See Id.* at 114:24–115:13.)

Chlad's total income in 2013, as reported on her tax return, was $117,505. (PX 15.) The Debtors' statement that Chlad's 2013 income was approximately $90,000 was therefore incorrect.  She testified that she estimated her 2013 income based on her 2012 income, which was in the $90,000 range. (*See* Trial Tr., vol. I, 78:20–24; PX 4, at 1.)  She also testified that she did not have a set salary from Lockwood but her income was based on distributions and draws from Lockwood when they were available and needed. (Trial Tr., vol. I, 84:15–85:10, vol. II, 157:12–15.)  Chlad received her 2013 tax return from her tax preparer in or about November, 2014, several months after the Schedules were filed. (Trial Tr., vol. III, 87:15–17; PX 15, at 2.)

As of the date of trial, no amendments to the Schedules had been made to correct or more accurately describe the Debtors' income information.

Chlad received income in 2012, 2013, and 2014 from sources other than Lockwood. (Trial Tr., vol. I, 79:17–82:13.)  On Schedule I, the Debtors state that Chlad receives "income from real property" of $2,750 per month, and "alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above" of $1,700 per month. (PX 3, at 18.) The Debtors do not disclose how much Chlad received for each of these items on an annual basis in their Statement of Financial Affairs. (PX 4, at 1–2.)

15

The Debtors filed the Statement of Financial Affairs on January 14, 2014, so the Debtors had access to Chlad's bank statements for the year 2013 when they filed the Statement of Financial Affairs. (Trial Tr., vol. I, 86:23–87:5.)  Chlad deposited all of her income—from Lockwood, support payments from Vehovc, rental income, or other income—into her personal bank account at Citibank. (*Id.* 85:21–86:22.)  The monthly statements for Chlad's Citibank account with an account number ending in 4464 show that $119,531.68 was deposited into the account in 2013.  Of this, $3,141.93 was for returns or bounced checks, leaving $116,389.75 in money that Chlad deposited into her account in 2013. (*See* PX 16.)

The Debtors knew that Vehovc had paid alimony, maintenance, or support to Chlad in 2013, and that Chlad received income from rental properties. (Trial Tr., vol. I, 79:17–82:13, vol. IV, 98:8–21.)  The Debtors therefore knew or should have known that Chlad's source of income was not just Lockwood.

<u>Chlad's Alias</u>

The voluntary petition requires debtors to state the "Name of Debtor (if individual, enter Last, First, Middle)." The form also requires debtors to state "All Other Names used by the Debtor in the last 8 years." (PX 1, at 1.)

On the Petition, the Debtors stated that Chlad's name was "Chlad, Monik." Under "All Other Names," the Debtors stated "NONE." (*Id.*)

Prior to and after the Petition Date, Chlad regularly used the first name "Monika" in her business and financial affairs.

Chlad's personal bank account, her joint account with Jadwiga Chlad, and her joint account with Furca all use the first name "Monika." (PX 16, 22, 23.)

Chlad's personal tax returns for 2010, 2011, 2012, and 2013 were filed using the first name "Monika." (PX 15, 24, 25, 26.)

Chlad's Social Security number was issued under the name "Monika." (Trial Tr., vol. I, 138:13–21.)

16

Chlad's driver's license was issued under the name "Monika." (Trial Tr., vol. III, 76:10–12.)

On a questionnaire Chlad filled out to provide information to her bankruptcy attorney about her personal and financial affairs, Chlad stated that she had used the first name "Monika" in the past six years. (PX 27, at 1.)

Vehovc admitted that, on the Petition Date, he knew that Chlad regularly used the first name "Monika" in her business and financial affairs. (Trial Tr., vol. IV, 114:7–12.)

Therefore, the Debtors knew or should have known that their statement that Chlad did not use a name other than "Monik" was incorrect.

Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### I. JURISDICTION AND VENUE

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer bankruptcy proceedings to a bankruptcy judge under 28 U.S.C. § 157, and this proceeding was thereby referred here by Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J). It seeks to determine the Debtors' entitlement to a discharge pursuant to 11 U.S.C. § 727(a). Therefore, it "stems from the bankruptcy itself" and may constitutionally be decided by a bankruptcy judge. *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### II. DENIAL OF DISCHARGE

Bankruptcy relief is limited to the honest but unfortunate debtor. *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991); *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). The discharge is intended to allow a fresh start to the debtors, so they can "reorder their

affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan*, 498 U.S. at 286 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934). In exchange for the fresh start, the "Bankruptcy Code requires debtors to accurately and truthfully present themselves before the court." *In re Bostrom*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002).

Under § 727(a)(4)(A), a debtor's discharge may be denied if the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." To prevail on a section 727(a)(4) claim, a plaintiff "must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat*, 635 F.3d at 978; *see Grochocinski v. Campbell (In re Campbell)*, 475 B.R. 622, 638 (Bankr. N.D. Ill. 2012). A false oath may include a knowing and fraudulent statement or omission. *Grochocinski*, 475 B.R. at 638.

In this case, the Debtors made multiple flase statements under oath on their Petition, Schedules, and Statement of Financial Affairs. The Debtors each knew or should have known that the statements were false, and the false statements were material to the Debtors' bankruptcy case. The Debtors made these false statements with fraudulent intent. Accordingly, the Debtors discharge must be denied pursuant to § 727(a)(4)(A).

**A. Debtors made statements under oath.**

The Debtors in this case do not dispute that the statements in question were made by them under oath. For purposes of § 727(a)(4)(A), a debtor's petition, schedules, statement of financial affairs, and statements made at a § 341 meeting all constitute statements under oath. *New Century Bank, N.A. v. Carmell (In re Carmell)*, 424

18

B.R. 401, 418 (Bankr. N.D. Ill. 2010).   Accordingly, this first element of Chapman's
§ 727(a)(4)(A) has been established.

### B. Debtors made statements that were false, that they knew or should have known were false, and that materially related to their bankruptcy case

#### 1. The Debtors did not disclose real estate that they owned and falsely reported an associated mortgage.

On Schedule A, the Debtors did not disclose any interest in the Van Buren

Property.  On the Petition Date, the Debtors personally owned the Van Buren Property.

On Schedule D, the Debtors listed an $80,000 mortgage as secured by the Hamlin

Property.  The $80,000 mortgage was in fact secured by the Van Buren Property.  The

Debtors' omission of the Van Buren Property from Schedule A and their statement that

the $80,000 mortgage was secured by the Hamlin Property were false statements.

Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

The evidence shows that the Debtors knew or should have known that they

personally owned the Van Buren Property and the status of liens on that property.

They therefore knew or should have known that their schedule statements pertaining

thereto were false.  Prior to the Petition Date, the Debtors told their bankruptcy attorney

that they owned the Van Buren Property and that the $80,000 mortgage was secured by

the Van Buren Property.  Vehovc personally researched the properties that they owned.

Chlad submitted a report to the Debtors' bankruptcy attorney, which identified the

properties that they owned, and the status of liens on each property.  She participated

in discussions about the properties, including the Van Buren Property.  In

communications with the Debtors' bankruptcy attorney, the Van Buren Property was

identified as one of four properties that the Debtors would want to retain in a potential

reorganization under Chapter 11 of the Bankruptcy Code—two were owned by the

Debtors personally and two were owned by Lockwood. (*See* PX 7.)  Accordingly, the

Debtors were aware that they held an interest in the Van Buren Property.

19

The evidence also shows that the Debtors knew or should have known that the omission of the Van Buren Property from their Schedule A was a false representation. Prior to filing the Schedules, the Debtors' bankruptcy attorney reviewed the Schedules with the Debtors page by page, and were advised of the consequences of submitting incorrect or false information. The Debtors testified that they reviewed their Schedules before signing them under oath. At the time they filed their Schedules, the Debtors knew or should have known that they owned the Van Buren Property and that the Van Buren Property secured the $80,000 mortgage. Therefore, Chapman has established the Debtors knew that their statements were false.

The Debtors have argued that the omission of the Van Buren Property was inadvertent, and point out that they disclosed their interest in that property to their attorney and he mistakenly omitted it from their Schedules. But the Debtors are not exempted from their responsibility of reviewing documentation prepared by their attorneys that they later sign under oath and submit to the Court. Even though their bankruptcy attorney testified that he received accurate information but mistakenly omitted the Van Buren Property and listed the lien on that property for a different property owned by the Debtors, he also testified and the Debtors do not dispute that they reviewed their Schedules page by page with their attorney before signing and submitting them. This evidence casts doubt on their testimony that the omission of the Van Buren Property from their Schedules was inadvertent. *See Lardas v. Grcic*, 847 F.3d 561, 570 (7th Cir. 2017), *reh'g denied* (Mar. 15, 2017) (affirming bankruptcy courts' conclusion that misstatements were not inadvertent but rather intentional where the debtor reviewed the schedules with his attorney).

The omission of the Debtors' interest in real property from their schedules was a false statement that materially related to their bankruptcy case. A fact is material if "it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's

20

property." *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011).  Although the Debtors have argued that the property was fully encumbered to suggest that its omission was harmless, "[d]isclosure is mandatory even if a debtor believes an asset to be worthless or unavailable to the bankruptcy estate." *In re Varan*, No. 11 B 44072, 2014 WL 2881162, at *7 (Bankr. N.D. Ill. June 24, 2014).  "In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors." *Stamat*, 635 F.3d at 982.  "Proof of harm is not a required element of a cause of action under Section 727." *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 968 (7th Cir. 1999).

The fact that the Van Buren Property was the Debtors' property, and the identity of the property securing the $80,000 mortgage, bear a relationship to the Debtors' estate and business dealings and to the existence of the Debtors' property. The Van Buren Property and the $80,000 mortgage are material to the Debtors' bankruptcy case. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

### 2.  The Debtors did not disclose a significant creditor.

On their Schedules, the Debtors did not disclose Edgebrook Bank as a creditor. On the Petition Date, Edgebrook held a claim against the Debtors on account of the Debtors' personal guaranty of an $812,000 loan Edgebrook made to Lockwood. Therefore, Edgebrook Bank was a creditor of the Debtors, 11 U.S.C. § 101(10), and should have been listed on the Debtors' Schedules.  The Debtors' omission of Edgebrook from their Schedules was a false statement. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

The evidence also shows that the Debtors knew that the omission of Edgebrook Bank from their list of creditors was a misrepresentation.  The $812,000 loan from Edgebrook to Lockwood was Lockwood's largest single loan, and the Debtors' largest

21

single guaranty. The Debtors had multiple conversations with Edgebrook Bank representatives prior to and after the Petition Date relating to their potential personal liability. At the time they filed their Schedules, the Debtors knew or should have known that Edgebrook Bank was a creditor. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

The existence and identity of a large creditor relates to the Debtors' business dealing and is material to their bankruptcy case. The Debtors have claimed that they had received assurances from Edgebrook Bank representatives that the bank would try to work out a release of their guarantees. However, the evidence shows that the guarantees were in effect as of the Petition Date and that the Debtors were aware that they remained liable under those guarantees until released. Accordingly, Edgebrook Bank was a creditor and the existence of the guarantees was material to the bankruptcy case. *See In re Katsman*, 771 F.3d 1048, 1051 (7th Cir. 2014) ("A bankruptcy proceeding can't be concluded without knowledge of who the debtor's creditors are, unless omitting to mention them would be immaterial, which it would be only if the amount owed them was utterly trivial." (internal citations omitted)). Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

3.  The Debtors did not disclose two bank accounts that Chlad owned.

On Schedule B, the Debtors disclosed just one bank account owned by Chlad, an account at Citibank with an account number ending in 4404.

On the Petition Date, Chlad owned two additional accounts at Citibank: one with Jadwiga Chlad with an account number ending in 5647, and one with Mariusz Furca with an account number ending in 7296. The Debtors' omission of the undisclosed accounts from Schedule B was a false statement. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

Both Debtors have testified that they knew about the undisclosed accounts. Chlad used the undisclosed accounts before and after the Petition Date. At the time

22

they filed their Schedules, the Debtors knew or should have known about the undisclosed accounts. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

The undisclosed accounts relate to the Debtors' business dealings and to dispositions of the Debtors' property, and are therefore material to the Debtors' bankruptcy case. Debtors have argued that the accounts are immaterial because they held little to no funds at the time. But the balance contained in undisclosed accounts is irrelevant to whether they are material to the bankruptcy case. After all, debtors are required to disclose even bank accounts that were closed pre-bankruptcy and therefore have no balance at all. (*See* PX4, at 5.) A debtor "may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious." *Stamat*, 635 F.3d at 982–83 (*quoting In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992)); *see Matter of Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992) ("Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate"). Accounts shed light on debtors' financial history, even if they have low or no balances on the particular date the debtors file for bankruptcy. The undisclosed accounts are material to the Debtors' bankruptcy case. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

4. <u>The Debtors did not disclose the transfer of assets to relatives in Poland and to others.</u>

The Debtors did not disclose any transfers to Jadwiga Chlad or Mariusz Furca on their Statement of Financial Affairs. In the two years prior to the Petition Date, the Debtors transferred at least $2,648.02 to Jadwiga Chlad, and at least $21,339 to Mariusz Furca. The Debtors' omission of these transfers from their Statement of Financial

Affairs were false statements. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

Chlad made the transfers using bank accounts in Chlad's name, both shortly before and after the Petition Date. Both Debtors knew about Chlad's accounts, and that the purpose of the accounts was to transfer money to others. At the time they filed their Statement of Financial Affairs, the Debtors knew or should have known about the undisclosed transfers. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

The undisclosed transfers relate to the Debtors' business dealings and the disposition of the Debtors' property, and are therefore material to the Debtors' bankruptcy case. Accordingly, Chapman has established this element of his claim under § 727(a)(4)(A).

>    5.   <u>The Debtors did not disclose a shareholder loan or payments on that loan.</u>

On Schedule F, the Debtors do not disclose Lockwood as a creditor. In response to Question 3(c) of the Statement of Financial Affairs, the Debtors do not list any transfers to Lockwood within the year prior to the Petition Date.

As the 100% shareholder of Lockwood, Chlad is the person in control of Lockwood. Therefore, Lockwood is an insider of the Debtors. 11 U.S.C. § 101(31)(A)(iv).

On December 31, 2012, Chlad owed a shareholder loan to Lockwood in the amount of $51,165. By December 31, 2013, the shareholder loan had been repaid. The Debtors omission of the shareholder loan from their Schedules or its repayment from their Statement of Financial Affairs were false statements. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

The shareholder loan was detailed in Lockwood's pre-bankruptcy tax returns, and in its 2013 tax return. The Debtors reviewed these returns before they were filed.

At the time they filed their Schedules and Statement of Financial Affairs, the Debtors knew or should have known about the shareholder loan and the reductions of that loan. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

The shareholder loan and its reduction relates to the Debtors' business dealings and to the disposition of the Debtors' property. The shareholder loan and its reduction is therefore material to the Debtors' bankruptcy case. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

### 6.  The Debtors misstated the sources of income they received.

On the Statement of Financial Affairs, the Debtors state that Vehovc's 2012 income was solely from American Enterprise Bank. In 2012, Vehovc received income from American Enterprise Bank, but he also received income of $15,500 from Lockwood.

On the Statement of Financial Affairs, the Debtors state that Chlad's income from 2013 was "90,000 (est)" and that Lockwood was the sole source of this income. In 2013, Chlad's income was at least $117,505.

In 2012, 2013, and 2014, Chlad received income from source other than Lockwood, including alimony, maintenance, or support payments from Vehovc and rental property income.

The Debtors' statements regarding the source of Vehovc's 2012 income, the amount of Chlad's 2013 income, and the sources of Chlad's income were false. Therefore, Chapman has established this element of their claim under § 727(a)(4)(A).

The evidence also suggests that the Debtors knew or should have known that at least some of this information was incorrect. Vehovc received a W-2 showing income from Lockwood in 2012. The Debtors acknowledged on Schedule I that Chlad received income from sources other than Lockwood: specifically, alimony, maintenance, and support from Vehovc and rental property income. At the time they filed their

Statement of Financial Affairs, the Debtors knew or should have known that Vehovc received income from Lockwood in 2012 and that Chlad received income from sources other than Lockwood. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A) as to those statements.

Debtors' statement estimating Chlad's income, however, was not shown to have been a knowing false statement. While the Debtor's Schedules and Statement of Financial Affairs were filed in January of 2014, Chlad testified that she did not receive her 2013 tax return from her tax preparer until several months later. Moreover, her 2013 income was listed as an estimate. Her testimony that she relied on her income from 2012 was credible.

Statements about the sources of the Debtors' income relate to their business dealings and are therefore material. Therefore, misrepresentations in this respect were material for purposes of § 727(a)(4)(A).

> 7. <u>The Debtors did not disclose Chlad's use of the name "Monika."</u>

On their Petition, the Debtors stated that Chlad's first name was "Monik" and that she had not used any other names in the last eight years. Prior to and after the Petition Date, Chlad regularly used the first name "Monika" in her personal and financial affairs. The Debtors' statement that Chlad used no other names in prior years was false. Therefore, Chapman has established this element of their claim under § 727(a)(4)(A).

The Debtors knew that Chlad had regularly used the name "Monika" in prior years. Chlad used the first name "Monika" on her tax returns, bank accounts, and in other contexts. Both Debtors testified that they knew about Chlad's alias. At the time they filed their Petition, the Debtors knew or should have known that the omission of Chlad's alias was a misrepresentation. Therefore, Chapman has established this element of his claim under § 727(a)(4)(A).

26

Chlad's use of another name in prior years relates to the Debtors' business dealings and to the disposition of their property, as Chlad maintained bank accounts and conducted business under that alias. Omissions in this respect are therefore material to the Debtors' bankruptcy case. Accordingly, Chapman has established this element of their claim under § 727(a)(4)(A).

### C. The Debtors made false statements with fraudulent intent.

To find the requisite degree of fraudulent intent, a court must find that the debtor knowingly intended to defraud, or engaged in behavior that displayed a reckless disregard for the truth implying fraudulent intent. *In re Yonikus*, 974 F.2d 901, 905 (7th Cir 1992); *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011) ("[A] showing of reckless disregard for the truth is sufficient to prove fraudulent intent."). "Intent to defraud involves a material representation that you know to be false, or, that amounts to the same thing, an omission that you know will create an erroneous impression." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998); *see also In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014) (noting that "'fraudulent' in bankruptcy law includes intending to deceive, which need not connote intending to obtain a pecuniary benefit." (internal quotation marks and citation omitted)). Fraudulent intent may be "based on inferences drawn from a course of conduct." *Yonikus*, 974 F.2d at 905. Moreover, a series of false statements, when considered together, may evidence reckless disregard for the truth. *Stamat*, 635 F.3d at 981; *Katsman*, 771 F.3d at 1050. After all, the "successful functioning of the Bankruptcy Code hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Stamat*, 635 F.3d at 983 (citation omitted).

In this case, the Debtors made a series of statements that they knew were false and material. This pattern of false statements alone evidences reckless disregard for the truth, which is sufficient to establish that the Debtors' false statements were intentional and fraudulent. *See Katsman*, 771 F.3d at 1050; *Stamat*, 635 F.3d at 982.

27

For instance, the Debtors' knowing omission of Edgebrook Bank from their list of creditors, along with their failure to disclose two shared bank accounts and recent transfers to entities using those accounts suggests reckless indifference for the truth of the representations made in their Schedules and Statement of Financial Affairs sufficient to impute fraudulent intent. *See Katsman*, 771 F.3d at 1050. The small amount in the accounts does not excuse the Debtors' failure to list the accounts. *See Yonikus*, 974 F.2d at 904 ("Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate"). Similarly, the Debtors' belief that Edgebrook Bank would not seek to enforce the guarantees does not excuse the Debtors from disclosing those obligations. *Cf. Katsman*, 771 F.3d at 1050 ("Conceivably [the debtor] did not understand the legal meaning of 'creditor,' and thought someone she hoped to repay in the future was therefore not a creditor. But failing to seek advice of counsel, while knowing that she lacked legal training or knowledge, bespoke a reckless indifference to truth, and no more is required for fraudulent intent in bankruptcy").

As to the Van Buren Property, the Debtors were shown to have known that they owned that property. Their assertion that they disclosed their interest in that property to their attorney but their attorney failed to list it in their Schedules does not excuse them, where the Debtors testified that they reviewed their schedules page by page with their bankruptcy attorney prior to signing them under oath. Instead, this testimony tends to suggest that their omission was not inadvertent but was intentional and fraudulent. *See Lardas v. Grcic*, 847 F.3d 561, 569–70 (7th Cir. 2017), *reh'g denied* (Mar. 15, 2017). When viewed in light of other omissions and misrepresentations, Debtors pattern of omissions and misrepresentations is sufficient to prove that the Debtors' false statements were intentional and fraudulent. *See, e.g., Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011) ("While an over-reporting of one's income by itself would likely not amount to fraudulent intent, this error was part of a larger picture of omissions and

errors. Here, the totality of the Stamats' omissions and errors rises above mere negligence to the level of reckless disregard for the truth").

While Debtors' testified that they believed the information submitted in their Schedules and Statement of Financial Affairs was accurate and that false statements and omissions were inadvertent, the evidence shows that the Debtors knew or had reason to know that their representations were false and material, even if they thought they were harmless. This is not a case of a debtor who under exigent circumstances is forced to prepare schedules in a hurried manner. The Debtors are not *pro se* debtors who initially misunderstand the information requested in the schedules and later correct it. Rather, the Debtors are educated individuals who once ran a successful real estate business, owned and managed several investment properties; well before they commenced this case, they personally investigated their financial affairs and sought the advice of and were represented by experienced bankruptcy counsel. Under these circumstances, their misstatements and omissions display reckless disregard for the truth sufficient to imply fraudulent intent under § 727(a)(4)(A). *See, e.g., Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011) ("Given the Stamats' level of education and business experience, their failure to disclose the required past business interests, property transfers, and income as discussed above shows a reckless disregard sufficient for the bankruptcy court's finding of intent under section 727(a)(4) . . ."); *In re Chavin*, 150 F.3d 726, 729 (7th Cir. 1998) ("Chavin is a mature and experienced businessman . . .").

Therefore, Plaintiffs have met their burden of proving that the Debtors' discharge should be denied.

## CONCLUSION

For the foregoing reasons, Judgment will be entered in favor of Chapman and against the Debtors denying the Debtors' discharge under 11 U.S.C. § 727(a)(4)(A).

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

**2 9 JUN 2017**

Dated this ___ day of June, 2017